No.   94-131

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

LESTER KILLS ON TOP,

Petitioner and Appellant,

-vs-

STATE OF MONTANA,

Respondent and Respondent.

APPEAL FROM:   District Court of the Sixteenth Judicial District,
In and for the County of Custer,
The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Richard J. Carstensen, Attorney at Law,
Billings,  Montana

Stephanie Ross, Attorney at Law,
Point Roberts, Washington  (argued)

For Respondent:

Hon.  Joseph P. Mazurek, Attorney General;
Clay R.  Smith, Solicitor, Helena, Montana
(argued)

FILED

JUL 1 7 1995

Filed:

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Submitted:   May 9, 1995

Decided:   July 17, 1995

Justice W. William Leaphart delivered the Opinion of the Court.

Lester Kills On Top (Appellant) appeals from an order of the Sixteenth Judicial District Court, Custer County, denying his petition for postconviction relief and writ of habeas corpus. We affirm in part, reverse in part, and remand for resentencing.

We restate the issues Appellant raises as follows:

1. Must Appellant's convictions or sentences be reversed because the State failed to disclose certain materials under the commands of Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215?

2. Did an abuse of process or outrageous governmental conduct occur which requires the granting of Appellant's petition?

3. Did Appellant receive ineffective assistance of counsel during his trial?

4. Did Appellant receive ineffective assistance of counsel during the penalty phase proceedings?

5. Did Appellant receive ineffective assistance of counsel during the course of his direct appeal to this Court?

6. May Montana courts apply a procedural bar to postconviction claims that could have been raised on direct appeal?

7. Was Appellant denied the right to a fair trial?

8. Was Appellant denied the right to a fair and impartial jury?

9. Did the prosecutor commit misconduct during Appellant's trial?

10. Did the State fail to corroborate the testimony of an

accomplice witness?

11. Was Appellant denied the right to confront the witnesses against him?

12. Were Appellant's rights violated by the presence of armed officers next to his counsel table during his trial?

13. Were Appellant's rights violated because he was not convicted by a unanimous jury?

14. Did the jury instruction regarding voluntary intoxication create a conclusive presumption of guilt?

**15.** Was the jury instruction regarding inference of criminal mental state unconstitutional?

16. Does Montana's death penalty scheme unconstitutionally prohibit the sentencer from considering a single mitigating factor sufficient to merit leniency?

17. Was Appellant subjected to double jeopardy?

**18.** Did this Court and the sentencing court misapply the statutory capital sentencing factors requiring leniency?

19. Did the trial court err in disclosing a psychological report to the prosecution?

**20.** Did the District Court err in dismissing Appellant's habeas corpus petition?

Background

At Appellant's trial, testimony was offered that Appellant, his brother Vernon Kills On Top, Diane Bull Coming and Doretta Four Bear encountered John Martin Etchemendy, Jr. sometime after midnight on October 17, 1987, outside a of bar in Miles City,

Montana. One of the group offered Etchemendy a ride from the bar. The group proceeded south towards Ashland, Montana. Testimony was given that Appellant and his brother beat Etchemendy severely, that Etchemendy's wallet and some checks were stolen, and that Etchemendy was forced to strip and was placed in the trunk of the car.

When the group arrived in Ashland, they picked up Lavonne Quiroz, an acquaintance of Vernon Kills On Top. The group proceeded to Rabbit Town, a community on the Northern Cheyenne Reservation and stopped there. Four Bear testified that she escaped from the group in Rabbit Town by running to a friend's house. The remaining individuals (Appellant, Vernon Kills On Top, Bull Coming, and Quiroz) drove south toward Gillette, Wyoming with Etchemendy in the trunk of the car. Testimony was given at trial that Appellant finally killed Etchemendy and dumped his body in an abandoned building outside of Gillette. A more complete statement of the facts regarding the criminal activity in this case may be found in State v. Kills On Top (1990), 241 Mont. 378, 787 P.2d 336 (Kills On Top I).

Appellant was tried before a jury and convicted of robbery, aggravated kidnapping, and deliberate homicide. He received a 40-year sentence for the robbery conviction and the death penalty for each of the other two convictions. He appealed his convictions and sentences to this Court, and they were affirmed in Kills On Top I.

Appellant filed a petition for postconviction relief and then filed an amended petition for postconviction relief and a petition

for a writ of habeas corpus on January 14, 1991. The District Court dismissed his petition for a writ of habeas corpus and granted the State summary judgment on the majority of his other claims because they could have been raised on direct appeal. The District Court ordered an evidentiary hearing on Appellant's remaining claims which were: ineffective assistance of counsel, outrageous governmental conduct, and failure to disclose <u>Brady</u> **material.** On May 3, 1993, the District Court entered its order denying Appellant's remaining claims for postconviction relief. This appeal followed. Additional facts appear in the remainder of this opinion where necessary.

<u>Issue 1</u>

Must Appellant's convictions or sentences be reversed because the State failed to disclose certain <u>Brady</u> materials?

<u>Brady</u> requires the prosecution to give the criminal defendant all requested exculpatory information material either to the defendant's guilt or to punishment. <u>Brady,</u> 373 U.S. at 87. The prosecution also **must** deliver to the defendant all evidence significant for impeachment purposes. United States v. Bagley (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. In order to require reversal of a defendant's conviction or sentence, the <u>Brady</u> violation must relate to material information. Recently in Kyles v. Whitley (1995), 63 USLW 4303, the United States Supreme Court reiterated the standard for determining materiality. The Court held that the defendant must show that there is a reasonable probability that had the information been provided, the result

would have been different or, stated another way, is it a trial resulting in a "verdict worthy of confidence"? Kyles, 63 USLW at 4308. The Court stated that:

> A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of trial." Bagley, 473 U.S., at 678.

Kyles, 63 USLW at 4308. The Court also emphasized that the effect of the suppressed Brady material must be considered collectively rather than on an item-by-item basis. Kyles, 63 USLW at 4308. With these principles in mind, we examine Appellant's Brady error claims to determine which claims demonstrate that information should have been provided to Appellant before examining the Brady information which should have been provided as a whole to determine whether Appellant meets the materiality test announced in Bagley and reaffirmed in Kyles.

A. What information should have been provided?

1. Diane Bull Coming's rape allegation

Appellant first claims that the State failed to produce an allegation made by Diane Bull Coming that she was raped by a jailer while in custody for charges related to this case. Bull. Coming agreed to a plea bargain with the State prior to Appellant's trial and testified for the State in Appellant's trial. Appellant argues that Bull Coming's rape allegation could have been used to impeach her by showing witness tampering or intimidation, by showing her lack of credibility if the accusations were false, or by attacking her credibility in reference to her plea agreement. The State argues that it is questionable whether this information would have

been admissible at trial and argues that Appellant still fails to meet the materiality requirement if the information is considered. The State concedes that evidence tending to show witness bias may be admissible. This information should have been furnished to the Appellant pursuant to Bradv and Bagley. Thus, we will consider it in our discussion of materiality.

### 2. Bull Coming's criminal record

Appellant contends that he should have been provided with records of Bull Coming's prior convictions for misdemeanor assault, misdemeanor theft, and other misdemeanors. The State argues that this information does not meet the materiality requirement. This information should have been furnished to the Appellant pursuant to Bradv and Bagley. We will consider it in our discussion of materiality.

### 3. Bull Coming's arior physical altercations

Appellant argues that the State should have discovered and provided him with information regarding Bull Coming's past physical altercations. However, there has been no indication that the State possessed such information and insufficient evidence that the State could or should have obtained this information through a reasonably diligent investigation. We will not consider this information in our discussion of materiality.

### 4. Autopsy photographs and terminoloqv

Next, Appellant contends that the State failed to provide him with autopsy photographs of Etchemendy showing his genital area. Appellant argues that this evidence would be important to support

7

a defense theory that Bull Coming had castrated Etchemendy. Appellant also contends that it was <u>Bradv</u> error for the State to fail to explain what institicial edema, a term used in the autopsy report, means. Appellant's argument fails since the autopsy report disclosed that Etchemendy had normal genitalia. The autopsy report stated that on microscopic examination, Etchemendy had institicial edema or a swelling in the tubules of the testes. This swelling would be consistent with an injury to the groin sustained during a fight or a beating, such as the "fight" between Appellant and Etchemendy and the beatings administered by Appellant and his brother. An explanation of institicial edema would not have been exculpatory. A photograph of Etchemendy's genital area would not have been exculpatory nor would it have been useful for impeachment purposes (a photograph would not have shown swelling detected only upon microscopic examination). We will not consider this information in our discussion of **materiality.**

5. Metal wipe

Appellant argues that the State's introduction of **a metal** pipe into evidence falls under a <u>Bradv</u> claim because the pipe should not have been introduced and if it had not, then the lack of the pipe would have been exculpatory. Appellant's argument is not properly raised in a <u>Brady</u> context. Appellant makes no contention that the State failed to inform him that the pipe would be introduced into evidence. We will not consider this argument in our discussion of **materiality.**

## 6. Jack Daniels bottle

Quiroz, another individual charged in connection with this case, testified that she had seen a bottle of Jack Daniels with blood on it. Appellant claims that the State violated <u>Brady</u> by failing to introduce this bottle because Bull Coming drank Jack Daniels. We find this argument unpersuasive as there is no indication that the State ever found or had possession of this bottle despite an extensive search for evidence. We will not consider this argument in our discussion of materiality.

## 7. Bull Coming's allegedly perjured testimony

Appellant contends that the State knowingly relied on, and emphasized, what he characterizes as Bull Coming's perjured testimony. This argument is not properly raised in the <u>Brady</u> context since, prior to trial, Appellant had access to Bull Coming's statements regarding the crime. We will not consider this argument in our discussion of materiality.

## B. Must Appellant's convictions be reversed for material Brady error?

Moving then to a discussion of materiality, we concluded above that two items merit consideration: the failure to disclose Bull Coming's rape allegation and the failure to disclose Bull Coming's criminal history. Appellant could have used Bull Coming's rape allegation to attempt to cast some doubt on Bull Coming's veracity or to show her propensity to manipulate others. Appellant could have used Bull Coming's assault and theft convictions to support his argument that Bull Coming had a violent nature and was the

9

dominant force in the robbery and in Etchemendy's death.

When viewing this information as a whole, we hold that there is not a reasonable probability that had this information been introduced, the outcome (i.e., the verdict) would have been different. Bull Coming was an important witness for the State, but she was not alone. Four Bear testified to seeing Appellant and his brother beat and kick Etchemendy at two different stops. Four Bear also testified that Etchemendy was stripped and placed in the trunk of the car. Quiroz testified to seeing Etchemendy in a battered condition, seeing Appellant washing blood off of his hands, and seeing Appellant threaten Etchemendy with a metal pipe. Lorraine Four Colors testified that Appellant told her that he had killed Etchemendy and that he and his brother had beaten him. Despite the State's failure to disclose Bull Coming's rape allegation and prior criminal record, our confidence in the verdicts is not undermined. Thus, we affirm the District Court's denial of Appellant's <u>Brady</u> claims in regard to his conviction.

<u>C. Must Appellant's sentences be vacated for material Brady error?</u>

Next, the <u>Brady</u> information must be analyzed for materiality in considering the punishment levied. <u>Brady,</u> 373 U.S. at 87. Focusing on Bull Coming's undisclosed rape allegation and on Bull Coming's undisclosed criminal record, which included convictions for misdemeanor assault and theft, we conclude that our confidence in the sentence is undermined. The undisclosed information regarding Bull Coming could have been used to support Appellant's contention that he was manipulated by Bull Coming. Section 46-18-

10

304, MCA, sets forth the mitigating factors to be considered by a court contemplating the imposition of a death sentence. One enumerated factor is that the defendant acted under extreme duress or under the substantial domination of another person. Section 46-18-304(3), MCA.

We cannot say that it is more likely than not that the undisclosed information would have changed the sentences imposed in Appellant's case. However, the appropriate test is whether there is a reasonable probability that the outcome of the sentencing hearing (i.e., Appellant's sentences) would have been different. We hold that there is a reasonable probability that, had Bull Coming's rape allegation and criminal record been provided to Appellant, the result of the sentencing proceeding could have been different. Therefore, we vacate Appellant's sentences imposed for robbery, aggravated assault, and deliberate homicide and remand to the trial court for resentencing.

<u>Issue 2</u>

Did an abuse of process or outrageous governmental conduct occur which requires the granting of Appellant's petition?

Appellant raises several claims of outrageous governmental conduct or abuse of process which could have been addressed or remedied at the trial court level. The State argues that since these claims could have been raised at the trial level or on appeal, they are barred from consideration in postconviction proceedings pursuant to § 46-21-105(2), MCA. However, the District Court ruled that these claims were not procedurally barred, and the

11

State has not cross-appealed that ruling. Thus, we address the merits of Appellant's contentions.

In his petition, Appellant alleged that his rights were violated by outrageous governmental conduct and abuse of process. He contends that: the State manipulated jurisdiction and witnesses to ensure the possible application of the death penalty; the Wyoming State Crime Lab handled the evidence; the State did not discover a bloody Jack Daniels bottle and introduced a metal pipe which was not in the same condition at trial as it was when found; and the State relied on, and emphasized, the "facially invalid" testimony of Bull Coming.

Appellant argues that the State conspired with Wyoming and federal officials to ensure that his case would be tried in Montana where the death penalty could be applied. Appellant was convicted of robbery, aggravated kidnapping, and deliberate homicide under the felony murder rule based on the underlying felony of aggravated kidnapping. In Kills On Top I, 787 P.2d at 343, we held that the State of Montana had jurisdiction to try Appellant for the crimes charged. As long as the State has jurisdiction over the crimes, the decision to bring charges in state court rather than federal court or one state's courts rather than another's should be left to the discretion of the prosecutor. We hold that the decision to bring charges in Montana does not constitute an abuse of process or outrageous conduct.

Appellant also argues that the State manipulated witnesses by allowing Four Bear and Quiroz to be charged in federal court and by

12

plea bargaining with Bull Coming. Four Bear and Quiroz were substantially less culpable than the other participants and their prosecution in the federal system was suited to their degree of culpability. The prosecutor reasonably exercised his discretion in offering Bull Coming her plea bargain in light of her testimony in Appellant's trial and Vernon Kills On Top's trial. We hold that the decisions to prosecute Four Bear, Quiroz, and Bull Coming in the manner chosen, and to use their testimony, does not amount to an abuse of process or outrageous governmental conduct.

Appellant next contends that the State relied on the "facially perjured" testimony of Bull Coming. The United States Supreme Court has held that introducing and relying on testimony which the prosecutor knows is perjured requires the reversal of a conviction. Napue v. Illinois (1959), 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. In Napue, the defendant was charged with murder in the shooting death of an off-duty police officer during an attempted robbery. One of defendant's co-conspirators, who had already been sentenced to 199 years in prison for his part in the crime, testified against the defendant. The prosecutor had promised the co-conspirator that he would attempt to have the co-conspirator's sentence reduced if he testified against the defendant. During the trial, the prosecutor asked the co-conspirator if he had received any promise of consideration from the prosecutor in return for his testimony. The co-conspirator replied that he had not. Although the prosecutor knew that this testimony was false, the prosecutor did nothing to correct it. Napue, 360 U.S. at 268.

13

In the present case, Bull Coming testified that while in Wyoming, Appellant beat Etchemendy with a rock, handed her the rock, and that she then dropped the rock on the spot and returned to the car. She testified that Appellant then returned to the car. The rock, however, was later discovered at a Montana residence where Appellant's brother and Quiroz had stopped after the murder. Appellant argues that Bull Coming's testimony that she dropped the rock in Wyoming is therefore perjury on its face. We disagree.

Bull Coming simply testified that she dropped the rock in Wyoming. She did not attempt to explain what happened to the rock after she dropped it. We cannot say that her testimony amounts to perjury on its face. Further, there is no indication that the prosecution knew that Bull Coming's testimony was false. The prosecutor's reliance on Bull Coming's testimony is quite different from the situation involved in Napue. There is insufficient evidence to consider Bull Coming's testimony perjurious. Thus, we hold that the prosecution's use of her testimony regarding the rock does not amount to outrageous governmental conduct or an abuse of process.

Appellant further argues that it was an abuse of process or outrageous governmental conduct for the Wyoming State Crime Lab to analyze evidence used in Appellant's prosecution in Montana. Appellant cites no authority, nor does our research reveal any, which holds that the use of another state's investigative unit amounts to an abuse of process or outrageous governmental conduct. Sharing resources in this case was rational. Early in the

14

investigation Wyoming authorities had key physical evidence in their possession, including Etchemendy's body. For the sake of continuity, it made sense for the same lab to continue with the investigation. We hold that the use of the Wyoming State Crime Lab for Appellant's prosecution in Montana did not constitute an abuse of process or outrageous governmental conduct.

Appellant next contends that the State failed to find a blood-stained bottle of Jack Daniels and that the State introduced the metal pipe at trial in a different condition than that in which it had been found. Appellant produced no evidence that the failure to find the bottle was an intentional omission on the part of the State. The State launched an exhaustive search for evidence in this case; the failure to discover the bottle does not amount to outrageous conduct or an abuse of process. Further, an officer testified that when the metal pipe was found, it had some substance on its surface. When the pipe was examined by the crime lab, an investigator removed the residue with a swatch in order to test its content. The residue was determined to be human blood. The prosecution sufficiently established the chain of evidence regarding the pipe and satisfactorily explained that the change in the pipe (absence of the substance) was due to testing performed by investigators. We hold that in this instance it was not an abuse of process or outrageous governmental conduct to introduce the pipe in a condition different than that in which it had been found.

Finally, Appellant raises four other theories under this issue: that the trial judge failed to disqualify himself, that the

courtroom was racially segregated, and that the State failed to reveal Bull Coming's criminal convictions and rape allegation. However, Appellant did not raise these theories in his petition for postconviction relief under his abuse of process/outrageous governmental conduct claims and did not raise these theories under his abuse of process/outrageous governmental conduct claims when he submitted his proposed findings of fact and conclusions of law to the District Court. The District Court did not address these theories in the context of an abuse of process or outrageous governmental conduct claim. On appeal, an appellant may not change the bases for his argument. State v. LaPier (1990), 242 Mont. 335, 345-46, 790 P.2d 983, 989. Thus, we will not address Appellant's new theories under this issue on appeal. We note in passing that three of these arguments (that the trial judge remained on the case, the failure to disclose Bull Coming's criminal record and rape allegation) are discussed under Appellant's <u>Brady</u> and/or ineffective assistance of counsel claims.

<u>Issue 3</u>

Did Appellant receive ineffective assistance of counsel during his trial?

This Court reviews ineffective assistance of counsel claims using the two prong test set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. McLain (1991), 249 Mont. 242, 815 P.2d 147. An appellant must show that counsel's performance **was** deficient and that the deficient performance prejudiced the appellant. <u>McLain,</u> 815 P.2d at 149.

16

To demonstrate that counsel's performance was deficient, an appellant must show that, considering all the circumstances involved, counsel's performance fell below an objective standard of reasonableness. Judicial scrutiny of counsel's actions **must** be highly deferential and courts must indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 688-89. To demonstrate prejudice:

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 694. With these standards in mind, we turn to Appellant's claim that he received ineffective assistance at trial.

Appellant makes numerous ineffective assistance claims regarding his counsel's performance during trial. Appellant first argues that trial counsel was ineffective for referring to Appellant during closing arguments as "a drunk" and "drunk as a skunk." However, the testimony introduced clearly indicated that Appellant had been drinking during the **time** of the criminal activity. At the evidentiary hearing for Appellant's postconviction claims, his trial counsel testified that he believed there was substantial evidence regarding Appellant's drinking and that it would have to be dealt with. Counsel attempted to use this fact to minimize Appellant's conduct by stating that one of the "fights" with Etchemendy commenced because both were drunk and

17

"drunks fight." Counsel also attempted to argue that Bull Coming exploited Appellant's apparently intoxicated condition to manipulate him to start a fight with Etchemendy so Bull Coming could steal Etchemendy's wallet. The District Court concluded, and we agree, that this tactic was consistent with counsel's strategy to paint Bull Coming as the dominant actor and manipulator of Appellant. We hold that trial counsel's argument was within the wide range of reasonable representation.

Appellant further argues that trial counsel's failure to object to the intoxication instruction amounted to ineffective assistance of counsel. The trial court gave the following jury instruction:

> A person who is in an intoxicated condition is criminally responsible for his conduct and an intoxicated condition is not a defense to any offense and **may** not be taken into consideration.in determining the existence of a mental state which is an element of the offense unless the defendant proves that he did not know that it was an intoxicating substance when he consumed, smoked, sniffed, injected, or otherwise ingested the substance causing the condition.

Appellant emphasizes that the instruction stated that an intoxicated person is criminally responsible for his conduct. Appellant contends that this portion of the instruction mandates that a jury find a defendant guilty of the charged **crime** if the jury finds that the defendant was intoxicated.' This argument is

---

[1] In contrast to our recent decision in State v. Egelhoff (Cause No. 93-405, July 6, 1995), Appellant does not contend that the intoxication instruction violated his due process rights by prohibiting the jury from considering intoxication in determining the existence of the requisite mental state. Appellant's challenge to the instruction is limited to the first clause of the first sentence.

without merit. Even if the jury found that Appellant was intoxicated, under the instructions as a whole, the State still had to prove each of the elements of the crime in order to establish criminal responsibility. The intoxication instruction merely advised the jury that intoxication does not excuse otherwise criminal conduct.

In addition, the intoxication instruction given at trial comes directly from § 45-z-203, MCA. Counsel has not cited, nor have we found, authority holding that counsel's performance is deficient for failing to object to an instruction directly quoting a statute in effect at the time of trial. We hold that trial counsel's performance was not deficient for failing to object to the intoxication instruction.

Appellant next argues that his trial counsel was ineffective for failing to object to the prosecutor's closing argument, during which the prosecutor summarized the State's version of the evidence by portraying himself as Etchemendy and narrating in the first person. The Ninth Circuit Court of Appeals has stated that:

> [b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the "wide range" of permissible professional legal conduct.

United States v. Necoechea (9th Cir. 1993), 986 F.2d 1273, 1281 (citation omitted). Here, upon review of the record, it appears that all material statements contained in the prosecutor's narration from the standpoint of the victim were supported by testimonial or other evidence admitted at trial. We hold that

19

Appellant's trial counsel was not deficient in failing to object to the prosecutor's closing argument.

Appellant contends that his trial counsel was ineffective for failing to object to the lack of corroborating evidence of Bull Coming's testimony. Appellant notes that § 46-16-213, MCA, provides that a person cannot be found guilty of an offense based on the testimony of an accomplice unless the testimony is corroborated by other evidence that in itself tends to connect the defendant with the commission of the offense.

Here, Bull Coming's testimony was not only corroborated by Four Bear and Quiroz, who were both charged with offenses related to the criminal episode at issue in this case, but also by Four Colors. Four Colors was not involved with the criminal activity in this case, nor was she charged with any crime. She testified that Appellant told her that he had killed Etchemendy and that he and his brother had beaten Etchemendy and taken some of his credit cards. There was also physical evidence introduced which corroborated Bull Coming's testimony. The failure to object does not constitute ineffective assistance of counsel when the objection lacks **merit** and would have been properly overruled. See State v. Rodgers (1993), 257 Mont. 413, 421, 849 P.2d 1028, 1033. Here, an objection that the State failed to corroborate Bull Coming's testimony would have been without merit and properly overruled. Thus, counsel's performance was not deficient in failing to object to a lack of corroboration.

Appellant next contends that his trial counsel was ineffective

20

for failing to sufficiently investigate and pursue a mental defect defense. Appellant's trial counsel did initially raise a mental defect defense and requested a court-appointed clinical psychologist to examine Appellant. The trial court appointed the psychologist of Appellant's choice to examine him. The psychologist examined Appellant and reviewed Appellant's hospital records before preparing his report. The report concluded that Appellant had the capacity to understand the proceedings against him, to assist in his own defense, and that he could appreciate the criminality of his conduct. After viewing the report, trial counsel withdrew notice of Appellant's intent to rely on a mental defect defense.

We agree with the Ninth Circuit Court of Appeals' holding that "[i]t is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." Harris v. Vasquez (9th Cir. 1990), 949 F.2d 1497, 1525. We hold that Appellant's trial counsel was neither deficient in his investigation of a mental defect defense, nor in his decision not to rely on such a defense.

Appellant further argues that his trial counsel was ineffective in the trial phase context for failing to move for a substitute judge. Judge H. R. Obert, who presided over Appellant's trial, informed the prosecutor and Appellant's attorneys that he had been an acquaintance of Etchemendy. Judge Obert also told counsel that he believed he could be impartial regardless of the acquaintance. Appellant's trial counsel stated that he did not

21

move for a substitute judge because he believed that Judge Obert might commit reversible error; because counsel was concerned that a replacement judge might be more adverse to his client than Judge Obert; and because Judge Obert's religious convictions may have predisposed him against the death penalty.

In neither Kills On Top I nor in this proceeding has it been demonstrated that Judge Obert committed prejudicial error while presiding over Appellant's trial. Although counsel's decision to retain a judge who had been acquainted with the victim is questionable, we hold that there is not a reasonable probability that the outcome of the trial, the guilty verdicts, would have differed had counsel moved for a substitute judge. Thus, Appellant has failed to meet the second prong of the Strickland test.

Appellant next argues that his trial counsel was ineffective in failing to move for a change of venue from Fallon County. Appellant was charged in Custer County but, upon Appellant's counsel's motion, venue was changed to Fallon County. Appellant contends that counsel was ineffective in failing to move for a second change of venue. Appellant argues that since Fallon County is a "rural" county adjoining Custer County, he could not receive a fair trial there.

Appellant's trial counsel testified that they believed a second motion for change of venue would be useless unless they could demonstrate that an impartial jury could not be impanelled in Fallon County. Following extensive voir dire, counsel decided that there was no basis to conclude that an impartial jury could not be

22

selected. There is no evidence of juror bias and insufficient evidence to overcome the strong presumption that counsel's performance fell within the wide range of competent assistance in deciding not to move for a second change of venue.

Appellant further argues that his trial counsel was ineffective in failing to adequately question prospective jurors about any association they might have had with the victim. The trial judge asked the entire panel of potential jurors if they had any association with "any person who may have initiated this complaint." Several eventual jurors were asked if they knew the Etchemendys and others were shown a witness list containing the names of some members of the Etchemendy family. None of the jurors stated that they knew the Etchemendys, although one juror stated that he had heard of Etchemendy's father. Two prospective jurors were excused for cause after informing the trial court that they knew the victim's family. Appellant has failed to demonstrate that any of the jurors knew the Etchemendy family. While trial counsel could have conducted a more thorough voir dire on this topic, we hold that there is not a reasonable probability that the outcome of Appellant's trial would have been different had his counsel more thoroughly questioned the jury panel.

Appellant next argues that his trial counsel was ineffective in failing to investigate and introduce evidence of Bull Coming's prior bad acts and criminal record. Bull Coming's criminal record, which included several misdemeanor convictions, was not released to Appellant's trial counsel. It cannot be said that Appellant's

23

trial counsel was deficient for failing to introduce something that he did not have in his possession. Appellant also argues that his trial counsel should have more thoroughly investigated Bull Coming's prior bad acts which demonstrate a "negative attitude" toward men.

Appellant's trial counsel conducted a thorough investigation into Bull Coning's role in the crimes. Appellant's postconviction counsel have been able to discover more information regarding Bull Coming's "negative attitude" toward men by interviewing Bull Coming's former husband, who was in Oklahoma at or just prior to the time of Appellant's trial. However, we will not appraise trial counsel's effectiveness simply by comparing the amount of information Appellant's postconviction counsel were able to compile versus information gathered by Appellant's trial counsel. We hold that trial counsel's investigation into Bull Coming's background falls within the wide range of competent assistance.

Appellant next contends that his trial counsel was ineffective for failing to investigate Appellant's "suicide attempt.?' In early October of 1987, before the criminal activity in this case took place, Miles City police officers took Appellant to Holy Rosary Hospital because he had threatened to kill himself. The attending physician observed that Appellant was acutely intoxicated and a possible candidate for injuring himself. Appellant was released from the hospital the following day after indicating no further suicide ideation.

One of Appellant's sisters informed his trial counsel of this

24

incident.   Counsel discussed this incident with Appellant and Holy Rosary's records were supplied to Appellant's court-appointed psychologist who examined Appellant pursuant to Appellant's notice of intent to rely on a mental defect defense.   We hold that Appellant's trial counsel was not deficient in failing to sufficiently investigate Appellant's "suicide attempt."

Appellant next contends that his trial counsel was ineffective in failing to object to a jury instruction which stated, in relevant part, that the jury could infer the existence of the requisite mental state from the acts of the accused and the facts and circumstances connected with the offense.  The disputed portion of the instruction is derived directly from § 45-2-103(3), MCA.

Appellant argues that the instruction violates due process as the United States Supreme Court reversed a conviction where the court instructed the jury that it is presumed that a person intends the ordinary consequences of his voluntary acts.   Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. However, we have held that an instruction or statute allowing a permissive inference does not violate the rule established in Sandstrom.   State v. Cowan (1993), 260 Mont. 510, 517, 861 P.2d 884, 888.  In addition, Appellant's present counsel has not cited, nor have we found, authority holding that counsel's performance is deficient for failing to object to an instruction directly quoting a statute in effect at the time of trial.  We hold that Appellant's trial counsel was not deficient for failing to object to the instruction regarding the requisite mental state.

25

Appellant next argues that his trial counsel was ineffective for failing to object to the trial court's instructions setting out the elements of aggravated kidnapping. Appellant argues that the multiple alternatives within the instruction infringed upon his right to a unanimous jury verdict. He also contends that this argument implicates his conviction for deliberate homicide since the underlying felony in his deliberate homicide conviction was aggravated kidnapping. The instruction setting out aggravated kidnapping read as follows:

> A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force, with either of the following purposes:
> (a) to facilitate commission of robbery or flight thereafter, or
> (b) to inflict bodily injury on or to terrorize the victim.

This instruction was patterned after Montana's statute on aggravated kidnapping. Appellant argues that the multiple alternatives within the instruction infringed upon his right to a unanimous jury verdict. He argues that his trial counsel should have objected to the instruction because it is impossible to tell which alternatives the jurors agreed on in finding him guilty. We disagree.

Appellant cites several cases from circuit courts of appeal supporting his position. However, all of these cases are factually distinguishable from this case and, more importantly, were decided before Schad v. Arizona (1991), 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555, a U.S. Supreme Court case which gives more guidance

26

here.  In Schad, an Arizona jury was instructed that murder in the first degree could be premeditated murder or murder committed in an attempt to commit robbery.  Schad contended that due to the instruction, it was possible that the jury was not unanimous in that six jurors could have agreed that he committed premeditated murder while six could have agreed that he committed murder in an attempt to commit robbery.

A plurality of the U.S. Supreme Court rejected the notion that the jury must "indicate on which of the alternatives it has based the defendant's guilt, . , . even where there is no indication that the statute seeks to create separate crimes."  Schad, 501 U.S. at 635-36.  The Court stated that it is:

> erroneous [to] assum[e] that any statutory alternatives are ipso facto independent elements defining independent crimes under state law, and therefore subject to the axiomatic principle that the prosecution must prove independently every element of the crime.  [Citations omitted.]  In point of fact . . . legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements of separate crimes. . . .
>
> In cases, like this one, involving state criminal statutes, the dissent's "statutory alternatives" test runs afoul of the fundamental principle that we are not free to substitute our own interpretations of state statutes for those of a State's courts.

Schad, 501 U.S. at 636 (footnote omitted).

In addition, while the Court noted that it was impossible to produce a single analytical model for determining whether "two means are so disparate as to exemplify two inherently separate offenses," the Court stated that the two means must "reasonably reflect notions of equivalent blameworthiness or culpability,

27

whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether." Schad 501 U.S. at 643. The Court held that Schad had failed to make out a case for such moral disparity and denied his petition. Schad, 501 U.S. at 643.

Appellant has not specified which of the alternatives in the aggravated kidnapping instruction he objects to, thus we assume that he proposes that this Court adopt a test whereby every alternative in an instruction must be separately and specifically found by a jury. This approach was rejected by the Schad Court and will not be adopted by this Court. We hold that the alternatives set forth in the aggravated kidnapping instruction constitute alternative means of committing the same offense. We also hold that Appellant has failed to demonstrate that the alternatives are so morally disparate as to represent inherently separate offenses. Since the alternatives represent different means of committing the same offense rather than separate offenses, under Schad, the jury need not indicate upon which alternative it bases the defendant's guilt. The trial court did not err in giving the disputed instructions. An objection based on the disputed instructions would have been properly denied, thus, Appellant's claim of ineffective assistance of counsel must fail. See Rodsers, 849 P.2d at 1033.

Appellant next contends that his trial counsel was ineffective in failing to object to the absence of Native Americans from the jury panel. In addition to two other factors, in order to

28

establish a prima facie case that his jury was not drawn from a fair cross-section of the community, Appellant **must** show a statistical discrepancy between the percentage of prospective jurors and persons in the community from the allegedly excluded class. State v. Bradley (1993), 262 Mont. 194, 200, 864 P.2d 787, 791 (citing Duren v. Missouri (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587).

We take judicial notice of census data from 1980 and 1990 for Fallon County which demonstrates that Native Americans made up approximately .37 percent of the population in 1980 and .29 percent of the population in 1990. Appellant's counsel could not have demonstrated that Native Americans were underrepresented in the makeup of the venire panel taken from Fallon County residents. Failure to object does not constitute ineffective assistance of counsel when the objection lacks merit and would have been properly overruled. See Rodgers, 849 P.2d at 1033. Thus, we hold that Appellant's trial counsel was not deficient in failing to object to the jury panel on the basis of a racially unrepresentative cross-section of the community.

Appellant next argues that his trial counsel was ineffective in failing to object to the presence of an armed officer in the courtroom stationed near the Appellant during the trial. Appellant argues that the presence of the officer abridged his right to a fair trial and his trial counsel should have made an objection.

The U.S. Supreme Court has held that the presence of armed officers in the courtroom is not inherently prejudicial.. Holbrook

29

v. Flynn (1986), 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525. Where a question of prejudice due to armed officers is raised, the question must be answered on a case by case basis. Holbrook, 475 U.S. at 569. In Holbrook, four armed and uniformed state troopers sat in the first row of the spectator's section behind the defendants' seats during the trial of six men accused of armed robbery. The Court distinguished the situation from that where the accused was forced to wear a jail uniform or was bound and gagged in the presence of the jury. Holbrook, 475 U.S. at 568. The Court held that it was not an unacceptable risk of prejudice for the jury to see four armed officers sitting in the first row of the courtroom's spectator section. Holbrook, 475 U.S. at 571.

In the present case, we hold that the presence of an armed officer in close proximity to Appellant during the trial proceedings was not prejudicial. An objection to the presence of the officer would have been properly denied, thus we hold that Appellant's trial counsel was not deficient in failing to object to the presence of armed officers. See Rodgers, 849 P.2d at 1033.

Appellant next contends that his trial counsel was ineffective in failing to object to a manipulation of jurisdiction in order to ensure that Appellant would be tried in a court where the death penalty was a possibility. In Kills On Top I, 787 P.2d at 343, we held that Montana had jurisdiction to try Appellant for the crimes with which he was charged. In our discussion under Issue 2 herein, we held that the decision to prosecute Appellant in Montana did not amount to an abuse of process or outrageous government conduct. An

30

abjection based on manipulation of jurisdiction would have been properly denied, therefore we hold that Appellant's trial counsel was not deficient in failing to object to the presence of armed officers.  See Rodgers, 849 P.2d at 1033.

Issue 4

Did Appellant receive ineffective assistance of counsel during the penalty phase proceedings?

Appellant raises numerous arguments in favor of his claim that he received ineffective assistance of counsel during his sentencing.  However, given our holding under Issue 1 in which we reverse Appellant's sentences, it is unnecessary for us to address this issue.

Issue 5

Did Appellant receive ineffective assistance of counsel during the course of his direct appeal to this Court?

Again, we review ineffective assistance of counsel claims using the standards set forth in Strickland.  McLain, 815 P.2d at 149. Appellant's ineffective assistance of counsel claims based on the performance of his counsel during appeal were raised in catchall allegations.  Under Appellant's guilt phase claims, the allegation raised in paragraph B.5.h. of his petition was that "[t]rial counsel failed to object to all errors raised in this Petition which could have been, but were not, raised on direct appeal."

The District Court refused to address this general claim as it duplicated specific claims in the amended petition.  Similarly, we

have addressed all of Appellant's specific claims of ineffective assistance of counsel at the trial stage, which encompassed all of Appellant's claims of error regarding the trial stage, thus we need not repeat that analysis here. Having held that Appellant's extensive ineffective assistance of counsel claims regarding the trial stage are insufficient, we hold that Appellant's claim that counsel was inadequate in failing to raise those same claims on appeal is also insufficient.

Next, under Appellant's ineffective assistance of counsel claims regarding the penalty phase, Appellant claimed, in paragraph C.6.h., that "Counsel failed to raise on direct appeal all issues in this Petition which could have been, but were not, raised." Because this claim was raised under Appellant's penalty phase claims and we have already held that Appellant's sentences must be vacated, we need not address this claim on appeal.

Issue 6

May Montana courts apply a procedural bar to postconviction claims that could have been raised on direct appeal?

The District Court ruled that several of Appellant's claims raised in his petition for postconviction relief were procedurally barred because they could have been raised on direct appeal. Section 46-21-105(2), MCA, states:

> When a petitioner has been afforded a direct appeal of the petitioner's conviction, grounds for relief that could reasonably have been raised on direct appeal may not be raised in the original or amended petition.

Section 46-21-105(2), MCA, clearly establishes a procedural bar to postconviction claims that could have been raised on direct appeal.

32

Appellant contends that the procedural bar cannot be applied to his case because it has not been firmly established or consistently applied. He bases his argument on a U.S. Supreme Court pronouncement that only a firmly established and regularly followed state practice may prevent subsequent federal court review of a federal constitutional claim. James v. Kentucky (1984), 466 U.S. 341, 104 S.Ct. 1830, 80 L.Ed.2d 346. We disagree with Appellant's argument. Appellant's argument is misplaced in this Court.

Appellant can raise his argument in federalhabeas proceedings following the exhaustion of his state remedies. Appellant's argument has been discussed in federal court cases dealing with postconviction and habeas claims. The federal courts and the U.S. Supreme Court:

> will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the court's decision.

Harris v. Reed (1989), 483 U.S. 255, 260, 109 S.Ct. 1038, 1042, 103 L.Ed.2d 308, 315.

The application of a state procedural bar is generally considered an independent and adequate state ground precluding federal habeas review. See Harris, 489 U.S. at 262. The bar to federal review will apply:

> unless the habeas petitioner can show "cause" for the default and "prejudice attributable thereto," [citation omitted], or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." [Citations omitted.]

33

<u>Harris,</u> 489 U.S. at 262.

Since Appellant's arguments regarding the procedural bar are aimed at federal courts rather than this Court, we need not address them. However, we note in passing that we recently held that:

> We have applied that statutory bar [in § 46-21-105(2), MCA] consistently. in order to prevent the abuse of postconviction relief by criminal defendants who would substitute those proceedings for direct appeal and in order to preserve the integrity of the trial and direct appeal. See' for example, In re the Petition of Evans (1991), 250 Mont. 172, 819 P.2d 156; Tecca v. McCormick (1990), 246 Mont. 317, 806 P.2d 11; State v. Gorder (1990), 243 Mont. 333, 792 P.2d 370; Duncan v. State (1990), 243 Mont. 232, 794 P.2d 331; In re Petition of Martin (1989), 240 Mont. 419, 787 P.2d 746.

In re the Petition of Manula (1993), 263 Mont. 166, 169, 866 P.2d 1127, 1129. A lack of absolute consistency in the application of a state's procedural bar is not necessarily fatal to a determination that a state's procedural bar is an adequate and independent state ground precluding federal habeas review. The U.S. Supreme Court, in reviewing the Florida Supreme Court's application of a procedural bar, stated:

> In the vast majority of cases, however, the Florida Supreme Court has faithfully applied its rule that claims not raised on direct appeal cannot be raised on postconviction review. [Citations omitted.]
> Moreover, the few cases that respondent and the dissent cite as ignoring procedural defaults do not convince us that the Florida Supreme Court fails to apply its procedural rule regularly and consistently.

Dugger v. Adams (1989), 489 U.S. 401, 411, n.6, 109 S.Ct. 1211, 1217, 103 L.Ed.2d 435, 445.

Section 46-21-105(2), MCA, was added to Montana's code in 1981. In State v. Henricks (1983), 206 Mont. 469, 474, 672 P.2d 20, 23, we cited Fitzpatrick v. State (1983), 206 Mont. 205, 671

34

P.2d 1, a postconviction case instituted before the effective date of § 46-21-105(2), MCA, in support of the proposition that we could consider issues Henricks raised in postconviction proceedings which could have been raised on his direct appeal.[2] Since Henricks was decided, we have not cited it for the proposition that this Court can review issues in postconviction proceedings which could have been raised on direct appeal. We now specifically overrule Henricks to the extent that it stands for the proposition that this Court can review issues in postconviction proceedings which could have been raised on direct appeal.

Appellant further argues that the procedural bar should not be applied in this case because there is no evidence that his counsel intentionally reserved claims in order to extend proceedings. We cannot agree that the procedural bar only applies when the State can prove that defense and appellate counsel intentionally withheld claims to cause delay. In accord with the plain language of § 46-21-105(2), MCA, we hold that claims which could reasonably have been raised on appeal are procedurally barred from consideration in postconviction proceedings, regardless of whether or not the failure to raise the claim was an intentional strategic decision of counsel to cause delay. We hold that the procedural bar of § 46-21-105(2), MCA, does apply to certain of Appellant's postconviction claims as discussed below.

---

[2] We eventually concluded that Henricks' allegations were not only untimely, but without merit. Henricks, 672 P.2d at 26.

35

Issue 7

Was Appellant denied the right to a fair trial?

Appellant argues that his right to a fair trial was violated because: 1) trial was held in Fallon County which adjoins Custer County, the county where the victim and his family resided; 2) an officer stationed next to Appellant possessed a firearm which was visible throughout the trial; 3) the courtroom was allegedly segregated; and 4) there was extensive pretrial publicity and the trial judge noted there was a carnival atmosphere during voir dire.

All of Appellant's fair trial claims reasonably could have been raised during his direct appeal to this Court. Therefore, his fair trial claims are procedurally barred from consideration in this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 8

Was Appellant denied the right to a fair and impartial jury?

Appellant argues that his right to an impartial jury was violated because there were no Native Americans in the venire panel or on the jury. He also argues that the absence of Native Americans from the venire panel violated the equal protection clause of the Fourteenth Amendment. In addition, he argues that the jurors were not sufficiently questioned about any possible connection with the victim's family or about possible racial bias.

The above claims reasonably could have been raised during his direct appeal to this Court. Therefore, his claims are procedurally barred from consideration in this postconviction appeal. Section 46-21-105(2), MCA.

36

Issue 9

Did the prosecutor commit misconduct during Appellant's trial?

Appellant contends that the prosecutor committed misconduct during the trial by knowingly presenting facially perjured testimony and emphasizing this testimony during closing argument. Appellant further argues that it was misconduct for the prosecutor, during closing argument, to portray a version of the events in the form of a first person narrative as the victim of the crime.

Appellant's misconduct arguments reasonably could have been raised during his direct appeal to this Court. Thus, his claims are procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 10

Did the State fail to corroborate the testimony of an accomplice witness?

Appellant argues that the State failed to corroborate the testimony of Diane Bull Coming. Because Bull Coming was an accomplice, her testimony had to be corroborated or Appellant's conviction cannot stand.

Appellant's argument reasonably could have been raised on direct appeal to this Court. Thus, his argument is procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 11

Was Appellant denied the right to confront the witnesses against him?

37

Appellant argues that because the State failed to disclose Bull Coming's eight misdemeanor convictions until discovery was conducted for his postconviction petition, his Sixth Amendment right to confront the witnesses against him was violated. He also argues that Rule 609, M.R.Evid., which prohibits impeachment of witnesses by use of prior criminal convictions would violate his right to cross-examine witnesses as contemplated in Davis v. Alaska (1974), 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. However, the present case is analogous to U.S. v. Bagley (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481.

In Bagley, Bagley was charged with 15 counts of violating federal narcotics and firearms statutes. In his discovery requests before trial, Bagley requested the names of the prosecution's witnesses and any deals, promises, or inducements made in exchange for testimony against him. Bagley was convicted on the narcotics charges and acquitted on the firearms charges. A few years after his conviction, Bagley discovered that two of the witnesses against him had contracts with the Bureau of Alcohol, Tobacco and Firearms which provided that each witness would receive $300 for gathering evidence and testifying against Bagley. Bagley, 473 U.S. at 669-71.

The Ninth Circuit Court of Appeals reversed Bagley's conviction holding that the failure to supply Bagley with this information violated his rights to cross-examination, as envisioned in Davis and this violation required automatic reversal, 719 F.2d at 1462. The U.S. Supreme Court reversed the Ninth Circuit. The

38

Supreme Court held that the situation in _Bagley_ was distinguishable from _Davis_ in that the trial court had not made a direct ruling restricting Bagley's scope of cross-examination. Further, the Supreme Court reasoned that:

> The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination.

_Bagley_, 473 U.S. at 678. The Supreme Court determined that Bagley's claim had to be examined in the _Brady_ context and remanded the case for a determination of whether there was a reasonable probability that the outcome of his case would have been different. _Bagley_, 473 U.S. at 677-78.

Here, the trial court never made a direct ruling which limited Appellant's scope of cross-examination in regard to Bull Coming. She was extensively cross-examined as to her role in the crime, the prior statements she had made to law enforcement officers, and her plea bargain agreement. We hold that Appellant's argument in regard to the State's failure to disclose Bull Coming's prior misdemeanor convictions is properly analyzed in a _Brady_ context rather than in the context of a non-existent trial court ruling limiting cross-examination.

Issue 12

Were Appellant's rights violated by the presence of armed officers next to his counsel table during his trial?

Appellant argues that the presence of an armed officer next to his counsel table throughout the trial violated his right to a fair trial and negated the presumption of innocence

39

Appellant's argument reasonably could have been raised on direct appeal to this Court. Therefore, his argument is procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 13

Were Appellant's rights violated because he was not convicted by a unanimous jury?

Appellant argues that since the jury was instructed on certain offenses with multiple alternatives (e.g., aggravated kidnapping), it is impossible to determine if the jurors were unanimous in finding the specific elements of the offenses for which Appellant was convicted. Appellant argues that this abridges both his Sixth Amendment right to a unanimous jury and his Eighth Amendment rights.

Appellant's argument reasonably could have been raised on direct appeal to this Court. Therefore, his argument is procedurally barred from consideration in this postconviction proceeding. Section 46-21-105(2), MCA. Appellant argues that it was plain error to give the instructions containing several alternatives. However, we addressed the merits of Appellant's arguments under Issue 3 and concluded that it was not error to give the disputed instructions. Obviously, the plain error doctrine does not apply.

Issue 14

Did the jury instruction regarding voluntary intoxication create a conclusive presumption of guilt?

40

The trial court instructed the jury on the law of voluntary intoxication. Appellant argues that his rights were violated when the trial court instructed the jury that a person who is in an intoxicated condition is criminally responsible for his conduct. Appellant contends that this portion of the instruction creates a conclusive presumption which compels a finding of guilt simply as a result of being intoxicated.

Appellant's arguments reasonably could have been raised on his direct appeal to this Court. Thus, his arguments are procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

## Issue 15

Was the jury instruction regarding inference of criminal mental state unconstitutional?

The trial court instructed the jury that the existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense. Appellant argues that this unconstitutionally allowed the jury to presume that he had the requisite criminal mental state.

Appellant's argument reasonably could have been raised on direct appeal to this Court. Thus, his argument is procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

## Issue 16

Does Montana's death penalty scheme unconstitutionally prohibit the sentencer from considering a single mitigating factor

sufficient **to merit** leniency?

Appellant contends that § 46-18-305, MCA, violates the Eighth and Fourteenth Amendments' prohibitions against imposing arbitrary and capricious death sentences. Section 46-18-305, MCA, provides that the court shall impose a death sentence if the court "finds one or more of the [statutorily enumerated] aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." Appellant argues that § 46-18-305, MCA, operates to effect a scheme whereby a single mitigating circumstance can never be sufficient to merit leniency.

Appellant's argument reasonably could have been raised on direct appeal to this Court. Thus, his argument is procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 17

Was Appellant subjected to double jeopardy?

Appellant argues that he was subjected to double jeopardy. Appellant was convicted of aggravated kidnapping and deliberate homicide. He was convicted of deliberate homicide under Montana's "felony murder rule," with the underlying felony being aggravated kidnapping. Appellant also argues that he was subjected to double jeopardy in that one of the aggravating circumstances enumerated by § 46-18-303, MCA, is that the offense was aggravated kidnapping which resulted in the death of the victim.

Appellant's arguments reasonably could have been raised on direct appeal to this Court. Therefore, his arguments are

42

procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 18

Did this Court and the sentencing court misapply the statutory capital sentencing factors requiring leniency?

Given our holding under Issue 1 (the Bradv issue) in which we reverse Appellant's sentences, we need not address this issue.

Issue 19

Did the trial court err in disclosing a psychological report to the prosecution?

In preparation of a potential mental defect defense, Appellant was examined by a clinical psychologist at his counsel's request. The psychologist's report was then provided to the prosecutors and the trial court as well as the Appellant. Appellant argues that requiring disclosure of the report compromised his ability to present his defense of mental defect and that the presentence report impermissibly relied on portions of the psychological report.

Appellant reasonably could have raised these arguments on direct appeal to this Court. Therefore, his arguments are procedurally barred from consideration during this postconviction proceeding. Section 46-21-105(2), MCA.

Issue 20

Did the District Court err in dismissing Appellant's habeas corpus petition?

The District Court dismissed Appellant's habeas corpus

petition relying on § 46-22-101(2), MCA, which provides that habeas corpus relief is not available to attack the validity of a conviction or sentence of a person adjudged guilty in a court of record who has exhausted the remedy of appeal. Appellant argues that this statute affects a suspension of the writ of habeas corpus.

Appellant argues that the statute violates Article II, Section 19, of the Montana Constitution which states "[t]he privilege of the writ of habeas corpus shall never be suspended." Appellant cites cases from other state courts which hold that state legislatures may not abolish habeas corpus. We find a U.S. Supreme Court case more applicable to the present case.

In Swain v. Pressley (1977), 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411, the U.S. Supreme Court held that other proceedings may be substituted in lieu of habeas corpus. The Court held that "the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus." Swain, 430 U.S. at 381.

We hold that the substitution of postconviction proceedings for habeas corpus proceedings when a petitioner has exhausted his right of appeal does not amount to a suspension of the writ of habeas corpus. Thus, we hold that § 46-22-101(2), MCA, does not affect a suspension of the writ in violation of Article II, Section 19, of the Montana Constitution. We hold that the District Court did not err in dismissing Appellant's habeas corpus petition.

44

We affirm the denial of Appellant's petition to the extent it sought reversal of his convictions. We reverse the denial of Appellant's petition to the extent it sought to vacate his sentences, and we remand to the trial court for resentencing.

_____
Justice

We concur.

_____
Chief Justice

_____

_____

_____

_____
Justices